WILLIAM A. BROWN and ALEXANDER T. HAMILL *vs.*
GEORGE M. BOKEE, Adm'r of MARY E. HAMILL.

*Reduction into Possession by the Husband of the Wife's Choses
in Action—Construction of Art. 93, sec. 32, of the Code—
Trover.*

M. E. H., wife of A. H., owned in her own right, certain United
States five-twenty coupon bonds, and certain certificates of indebt-
edness of the Mayor and City Council of Baltimore, termed Balti-
more City Stock, and died so possessed on the 12th November, 1877,
intestate and without issue. Her husband survived her, and died
intestate on the 16th May, 1878. After M. E. H's death, none of
the coupons on the bonds were cut off and delivered to A. H.
When the wife died the bonds were, and had been since the 15th
December, 1871, on special deposit for safe-keeping in the Safe
Deposit Co., where they had been deposited, as shown by the Co's
receipt, "through A. H., and subject to the order of either." At
her death this receipt and the stock certificates were in possession
of her brother, who, on the 9th April, 1878, delivered them to A.
H., taking his receipt therefor. A. H. was then sick and unable
to leave his house, up to the time of his death. His son applied
to the City Register to transfer the stock from the name of the
wife, to that of A. H., but was refused, unless A. H. applied in
person, which he never did. His son also applied to the treasurer
of the Safe Deposit Co., presented the receipt, and requested
delivery of the bonds for A. H., but was refused unless A. H.
appeared in person, or executed a power of attorney to withdraw
the bonds, neither of which he ever did. On the 2nd June, 1878,
the Co. delivered the bonds to the appellants as A. H's adminis-
trators, on the return of the receipt. The appellee was appointed
administrator of M. E. H., after A. H's death. In an action of
trover by him as such administrator, against the appellants, it was
HELD:

1st. That these bonds and stock were *choses in action* of the wife
within the contemplation of sec. 32, of Art. 93 of the Code.

2nd. That A. H. did no act by which these *choses in action* were
reduced into his possession.

3rd. That M. E. H. did not part with the legal dominion and control over the bonds by accepting the receipt in which were the words, "subject to the order of either;" and that the custody of them by the Co. after her death, was a continuance of the custody and deposit made by the wife, and was never terminated by the husband.

4th. That trover lay for the certificates of stock, as well as for the bonds.

A mere intention to reduce a wife's *choses in action* into possession is not sufficient; the acts to effect that purpose must be such as to change the property in them, or in other words, must be something to devest the wife's property, and to make that of the husband absolute.

APPEAL from the Baltimore City Court.

The case is stated in the opinion of the Court.

*Exception.*—At the trial before the Court without the intervention of a jury, the plaintiff prayed the Court to declare:

That the United States bonds and the certificates of city indebtedness, mentioned in the evidence and in the agreed statement of facts, were *choses in action* belonging to Mary E. Hamill at the time of her death; that there is no evidence in the case from which the Court can find that the said *choses in action* were reduced to possession by Alexander Hamill, her husband, during his life-time, and that, therefore, the said *choses in action*, on the death of the said Alexander, devolved upon the representatives of the said Mary, and the facts of demand by the plaintiff, and refusal by the defendants of said *choses in action* being admitted, the verdict must be for the plaintiff.

The defendants prayed the Court to declare:

1. That the action of trover cannot be supported for the bonds and certificate of stock mentioned in the evi-

dence, and, therefore, the verdict of the Court should be for the defendants.

2. That the United States bonds mentioned in evidence, are not *choses in action,* in the sense contemplated by Art. 93, sec. 32, of the Code.

3. That the certificates of stock debt of the Mayor and City Council of Baltimore, mentioned in evidence, are not *choses in action,* in the sense contemplated by Art. 93, sec. 32, of the Code.

4. That if the Court believe the five coupon bonds of the United States, mentioned in evidence, were, during her coverture, the property of the plaintiff's intestate, and that defendants' intestate was the husband of said plaintiff's intestate, and survived her, and after her death, demanded from the custodian thereof, the possession of said bonds, and that said bonds were delivered to said surviving husband, who received the same into his care and custody, then the said plaintiff cannot recover in this action the value of said bonds.

5. That if the Court believe that two certificates of indebtedness of the Mayor and City Council of Baltimore, mentioned in the evidence, were, during her coverture, the property of Mary E. Hamill, and that Alexander Hamill was her husband, and survived her, and that after her death, the said Alexander Hamill demanded from the custodian thereof, the said two certificates of indebtedness, and that said certificates were delivered to said Alexander Hamill, who retained the same during his life, and collected the interest thereon as it became due, and that after the death of said Alexander Hamill, letters of administration on his personal estate were granted by the Orphans' Court of Baltimore City to the defendants, who found said certificates of indebtedness among the personal effects of said Alexander Hamill, and took possession thereof, the plaintiff is not entitled to recover.

6. That the demand made by Alexander Hamill, as surviving husband of Mary E. Hamill, upon William F.

Bokee, the custodian thereof, and the delivery by said Bokee to said Hamill, in his life-time, of the certificates of stock, and certificate of deposit of coupon bonds of the United States, mentioned in evidence, was such a reduction into possession by the surviving husband of Mary E. Hamill, as vested the title in said property in said Alexander Hamill, and, therefore, the plaintiff is not entitled to recover in this action.

The Court, (GAREY, J.,) granted the prayer of the plaintiff, and rejected the prayers of the defendants; the defendants excepted, and the verdict and judgment being for the plaintiff, they appealed.

The cause was argued before BARTOL, C. J., MILLER, ALVEY and IRVING, J.

*J. Wilson Leakin* and *William A. Stewart,* for the appellants.

The appellants contend, that the bonds and stock in question are not *choses in action,* because they do not come within the meaning and intent of these words, as defined by standard writers on the subject. 1 *Bouvier's Institutes,* 191; *Williams' Pers. Prop.,* 199, 200; *Coke upon Littleton,* 351 *b; Sheldon vs. Sill,* 8 *How.,* 449; 2 *Kent's Com.,* 340, 347, 351; *Williams on Executors,* 784, (note *b;) Comyn Digest, Title Bien;* 1 *Chitty's Prac.,* 99; 2 *Blackstone's Com.,* 389, 397; *Williams on Pers. Prop.,* 7, 198, 375.

Bonds of the United States cannot come within the definition of a thing in action, because the government cannot be sued, without some special Act of Congress permitting it, and there is no such Act, allowing suit upon the bonds in question. *Briscoe vs. Bank of Kentucky,* 11 *Pet.,* 321; *United States vs. McLemore,* 4 *How.,* 288; *Hill vs. United States,* 9 *How.,* 389; *Reeside vs. Walker,* 11 *How.,* 290; *Case vs. Terrell,* 11 *Wall.,* 199; *Schouler on Pers. Prop.,* 615, 616.

The language of the Code, Art. 93, sec. 32, shows a legislative definition of the term *chose in action,* as a thing upon which a judgment may be obtained.   This section of the Code is in derogation of the common law, and must be construed strictly.   *Pembroke vs. Peacock,* 4 *Md.,* 280; *Hubbard vs. Barcus,* 38 *Md.,* 180; *Sedgwick's Statutory and Con. Law.,* 33; *Warner vs. Fowler,* 8 *Md.,* 25; *Dyson vs. West, Ex'r,* 1 *H. & J.,* 567; *Sedgwick, Construction, &c.,* 267, 268, 269, and notes; *Thistle vs. Frostburg Coal Co.,* 10 *Md.,* 129; *Peters' Circuit Court R.,* 188; *Potter's Dwarris' Statutes,* 185, 186, *n ; Stockett, Adm'r vs. Bird,* 18 *Md.,* 484.

The statute, although general in its language, does not cover either State or Government securities, for it is a well-known principle that the sovereign is not included in the statute, unless expressly named.   5 *Co. R.,* 146; 11 *Co. R.,* 70; 8 *Mod.,* 8; 1 *Str.,* 516.

The same doctrine is firmly established in Maryland. *Murray vs. Ridley,* 3 *H. & McH.,* 171; *Contee vs. Chew's Ex'r,* 1 *H. & J.,* 417; *The State vs. Bank of Md.,* 6 *G. & J.,* 226; *State vs. B. & O. R. R. Co.,* 34 *Md.,* 374; *Tiernan vs. Rescamiere,* 10 *G. & J.,* 225; *State vs. Milburn,* 9 *Gill,* 118; *Opin. of* TANEY, C. J., *in appendix to* 2 *How.*

It is contended, that the possession of the Safe Deposit Co. after the death of Mrs. Hamill, was the possession of the husband; and that the delivery of the receipt of the said company, and the certificates of indebtedness of the Mayor and City Council of Baltimore, by William F. Bokee, who held the same as agent of the appellee's intestate, in her life-time, to said Alexander Hamill, was a reduction into possession, and vested title in the surviving husband.   The Safe Deposit Co. was merely custodian for the true owner.   *Act of* 1876, *ch.* 27; *Tritt vs. Colwell,* 31 *Pa. State,* 233; *Boynton vs. Pano,* 67 *Me.,* 587; *Stewart vs. Redditt,* 3 *Md.,* 79.

The action of trover does not lie for a share of stock, although it is admitted that such an action may be

brought for the paper or certificate, under or by which the existence of the same is evidenced. *Sewell vs. Lancaster Bank,* 17 *S. & R.,* 285 ; *Pierce vs. Vandyke,* 6 *Hill,* 613; *Comparet vs. Burns,* 5 *Blackford,* 419.

*George H. Chandler* and *Robert D. Morrison,* for the appellee.

The securities in question are undoubtedly *choses in action,* if the ancient and usual definitions of that class of property are to be accepted as authority, or if the essential features and qualities of such property are to be regarded. 2 *Bl. Com.,* 396, 397, 433; *Co. Litt.,* 351; *Wms. P. P.,* 5, 61; 1 *Schoul. P. P.,* 86, 459.

Within the past century and a half, the exigencies of society have brought into existence some debts of a kind not known before, in which a large part of the wealth of modern times is invested. Some of these are commonly known as public debts, and are nothing else than loans of money for long periods, at fixed rates of interest, usually evidenced by bonds or other certificates of indebtedness. They have all the requisite elements of contracts of loan, and the certificates therefor are usually under seal, and are properly treated by the law as *choses in action.* See 1 *Schouler's Pers. Prop., part III, ch. II,* where the history and legal aspect of this species of personal property are fully considered.

It can obviously make no difference, whether the obligor or debtor is a King, a Nation, a State, a county, a municipal corporation, a private corporation, a co-partnership or an individual, if only the relation of debtor and creditor is duly established. *Wms. P. P.,* 183; *The Floyd Acceptances,* 7 *Wal.,* 666; *United States vs. Barker,* 12 *Wheat.,* 559; *Same vs. Bank of the Metropolis,* 15 *Pet.,* 377; *Bank of the U. S. vs. The United States,* 2 *How.,* 711.

The United States five-twenty coupon bonds in question are obligations for payment to the bearer of money bor-

rowed by the Government under the authority of law. As such, they are not money or currency, and have none of its essential and distinctive qualities. They are rather negotiable commercial paper, having all the peculiar features necessary to bring them under the law governing that class of property, as has been repeatedly held by the Supreme Court. 3 *Am. Law Review,* 218; 1 *Schoul. P. P.,* 614; *Vermilye vs. Adams Express Co.,* 21 *Wal.,* 138; *Texas vs. White,* 7 *Wal.,* 735; *Texas vs. Hardenberg,* 10 *Wal.,* 68; *Thompson vs. Lee County,* 3 *Wal.,* 327; *Arents vs. Commonwealth,* 18 *Gratt.,* 750; *Kearney vs. State,* 48 *Md.,* 16; *Ches. and O. Can. Co. vs. Blair,* 45 *Md.,* 102; *Hutchins vs. State Bank,* 12 *Metc.,* 421.

The decided tendency of the English cases is to the effect, that "stock in the funds" is not money, and is not included in the most liberal and comprehensive use of that word. *Wildman vs. Wildman,* 9 *Ves.,* 177; *Hotham vs. Sutton,* 15 *Ves.,* 319; *Gosden vs. Dotterell,* 1 *My. & K.,* 56; *Lowe vs. Thomas,* 5 *DeGex, M. & G.,* 316; *Same Case, Kay,* 369.

Coupon bonds of municipal and other corporations payable to bearer, are by recent American decisions to be considered as negotiable commercial paper, assignable by delivery. 1 *Schoul. P. P.,* 611; *Mercer County vs. Hackett,* 1 *Wal.,* 83; *Gelpcke vs. Dubuque, Ib.,* 175; *Myer vs. Muscatine, Ib.,* 384; *Thompson vs. Lee County, ante; Arents vs. Commonwealth, ante; Commonwealth of Va. vs. Chesapeake and Ohio Canal Co.,* 32 *Md.,* 501.

Much more then would the character of *choses in action* be impressed upon registered bonds or certificates of the city, acknowledging an indebtedness to a named person as obligee, and assignable only upon the books of the city by the obligee, in person or by attorney, and a delivery up of the original certificate. *Wms. P. P., ante;* 1 *Schoul. P. P.,* 616.

. Independently of the statute law, the things in action of the wife must, during the coverture, be reduced to possession of the husband by some positive, unequivocal and effectual act on his part. In case he survive her, the statute gives to him *jure mariti*, and without formality of administration, the right to her *choses in action* if reduced by him to possession in his life-time. Mere intention to reduce is not sufficient, and nothing on his behalf is to be presumed or inferred. So long as anything remains which can be done by him to acquire a better possession, the reduction is not complete. Debts due to the wife, legacies, distributive shares, arrears of rent, outstanding loans, promissory notes, and property *ejusdem generis*, are her *choses in action,* and must be actually reduced by the husband if he would assert a title thereto. 2 *Bl. Com.*, 434; 2 *Kent Com.*, 135, 351; *Schoul. Dom. Rel.*, 114; 1 *Bright Hus. & Wife*, 36–48; 1 *Wms. Ex'rs*, 755–765; 3 *Redf. Wills*, 187, 194; *Stockett vs. Bird*, 18 *Md.*, 484; *Crane vs. Gough*, 4 *Md.*, 316; *Slaymaker vs. Bank*, 10 *Pa. St.*, 373; *Peacock vs. Pembroke*, 4 *Md.*, 280; *Newcomer vs. Orem*, 2 *Md.*, 297; *Gallego vs. Gallego*, 2 *Brock.*, 285.

The acts of the husband in this case did not amount to a reduction. The rule of law upon this subject is ancient, technical and strict, subject to no equitable modification or amelioration, and the failure of the husband in this case to comply with its requirements, even though it were unintentional and owing to misfortune, or due to circumstances beyond his control, is fatal to the claim of his representatives. 1 *Wms. Ex'rs*, 360; *Bond vs. Conway*, 11 *Md.*, 512; *Stockett vs. Bird, ante; Hubbard vs. Barcus*, 38 *Md.*, 175; *Murray vs. Cannon*, 41 *Md.*, 466; *Ward vs. Turner*, 2 *Ves. Sr.*, 431; *Hayward vs. Hayward*, 20 *Pick.*, 517; *Arnold vs. Ruggles*, 1 *R. I.*, 165; *Collins vs. Carman*, 5 *Md.*, 503.

Whatever may have been the early rule, when personal property consisted chiefly of chattels, it is now the

settled practice, to bring trover for negotiable securities and instruments of the kind in controversy. *Add., Torts,* 316–318; 1 *Hill, Torts,* 47; *Cooley, Torts,* 447; *M. & C. C. of Balt. vs. Norman,* 4 *Md.,* 353; *Dean vs. Turner,* 31 *Md.,* 52; *Winner vs. Penniman,* 35 *Md.,* 163; *Kitchen vs. Bedford,* 13 *Wall.,* 413; *Kingman vs. Pierce,* 17 *Mass.,* 247.

MILLER, J., delivered the opinion of the Court.

Mrs. Mary E. Hamill died intestate and without issue on the 13th of November, 1877, leaving her husband, Alexander Hamill, surviving her, and on the 16th of May, 1878, he also died intestate. Letters of administration were then granted upon the estates of each, the appellants being the administrators of the husband, and the appellee the administrator of the wife. At the time of her death Mrs. Hamill owned in her own right five $1000 United States five-twenty coupon bonds, and $1100 of what is termed Baltimore City Stock. On the 28th of February, 1879, the administrator of the wife brought an action of trover against the appellants for the conversion of these bonds and this stock. The plea was not guilty, and the case was tried before the Court without the intervention of a jury.

By the Code, Art. 45, sec. 2, the "personal property" of the wife in case she dies intestate and leaving no children, is vested in the husband absolutely, but by Art. 93, sec. 32, it is provided: "If the intestate be a married woman, it shall not be necessary for her husband to take out administration, but all her *choses in action* shall devolve on her husband, in the same manner as if he had taken out such administration; *Provided,* that if he shall not in his life-time reduce the said *choses in action* into possession, or obtained judgment thereon, the said *choses in action* shall devolve on her representatives, and administration may be granted accordingly." It is

not necessary to notice the addition to this section by the Act of 1878, ch. 268, because it has no bearing upon the present case. These two sections of the Code were construed in the case of *Stockett vs. Bird*, 18 *Md.*, 484, and it was there decided they were both operative, and that the latter merely created an *exception* to the *general* provisions of the former. In the case now before us there are two main questions which we shall consider in their order.

1st. Are these bonds and stock *choses in action* within the contemplation of the section of the Code above referred to?

2nd. If they are *choses in action* did the husband in his life-time, and after the death of his wife, reduce them into his possession?

1st. As to the city stock but little need be said. The City of Baltimore negotiated loans, and issued to the lenders certificates acknowledging its *indebtedness* to them respectively for the several amounts borrowed, to be paid at a fixed future day, with interest at a fixed rate payable quarterly or semi-annually. These certificates are transferable only at the Mayor's office in person or by attorney, and on delivery of the certificate to the transferee. At her death, Mrs. Hamill held and owned two of these certificates, one for $800, and the other for $300. Certificates thus evidencing the debts or obligations of a municipal corporation are unquestionably *choses in action.* They fall within the strictest definition of those terms, have been so regarded by every text writer, and so adjudged by all the authorities in which the question has arisen.

It has been argued that the five-twenty bonds are not *choses in action* because no suit upon them can be brought against the United States. But if they are not *choses in action* what are they, and under what description of property or rights known to the law do they come? It is clear that whatever other qualities they may have, they are not

money or currency. They are widely different from legal tender notes. These latter are simply promises to pay on demand, bear no interest, were made to circulate as money, as they do in fact, and so far as Congress had power, were made a legal tender at their face value for all debts public and private, except duties on imports and interest on the *public debt.* But these bonds were authorized by a different law, subserved a different purpose, and in fact constitute part of the interest-bearing *public debt,* the interest on which is payable in coin. The substance . of the obligation expressed on their face is that the United States are " *indebted to the bearer,*" in the sum specified, redeemable at the pleasure of the United States after *five,* and payable at *twenty* years from the 1st of July, 1865, with interest at six per cent. payable semi-annually, and they have interest coupons attached. Being payable to holder or bearer and having a long time to run, it has been decided they have become by the necessities of modern usage negotiable paper with all the protection that belongs to that class of obligations. *Vermilye & Co. vs. Adams Express Co.,* 21 *Wall.,* 138. We shall not stop to inquire whether, under the legislation of Congress establishing the Court of Claims and defining its jurisdiction, a suit could be brought in that Court against the United States for default in payment of these bonds at maturity, because we do not deem it material. The public debt of Great Britain is redeemable only at the pleasure of the Government, and holders of that debt can therefore never bring an action against the debtor to recover it, not only because of the immunity of the Government from suit, but because by the terms of the obligations themselves they are not payable at any definite time. Stock or money in "the funds," as they are designated in the English authorities, is merely a right in the holder to receive certain annuities by half-yearly dividends as they become due, subject to the right of the Government to redeem such

annuities on payment of a stipulated sum; thus £100 three per cent. consolidated bank annuities, or three per cent. "consols" as they are shortly termed, is a right to receive three pounds per annum forever, subject to the right of the Government to redeem this annuity on payment of £100 sterling. Notwithstanding the absolute inability of the creditor to sue for them, moneys invested in these public stocks or funds have uniformly been treated by the English Courts as *choses in action.* In *Williams on Ex'rs* (7th *Eng. Ed.*) 846, and in *Roper on Husband & Wife,* 204, the learned authors include "money in the funds," as falling under the description of *choses in action.* of the wife which survive to her in case the husband fails to reduce them into possession during coverture, and the authorities cited by these eminent text writers fully sustain the position. In *Dundas vs. Duteus,* 1 *Ves., Jr.,* 196, a sum of £1000 in the three per cents. was declared by Lord ELDON to be a *chose in action,* and the same thing was said by the Master of the Rolls, Sir WM. GRANT, in *Scawen vs. Blunt,* 7 *Ves.,* 294, where the money in the funds was held to survive to the wife. In *Wildman vs. Wildman,* 9 *Ves.,* 174, a large sum in the three per cent. consolidated annuities was transferred to the name of a married woman as next of kin of an intestate, and this upon the death of the husband without having done any act with reference to it, except signing partial transfers of it by her, was held to survive to the wife. It is unnecessary to cite other authorities upon this point. If, then, the rights belonging to holders of the public debt of Great. Britain, which is redeemable at the pleasure of the debtor, and where by no possibility can a right of action accrue to the creditor, are nevertheless *choses in action,* it would seem *a fortiori* that the bonds in question which are payable to bearer and at a fixed future day, which pass by delivery and have become in fact negotiable securities, must be so regarded. The truth is that this species of property was.

unknown to the common law. The public debt of England, as well as that of the United States, has been created in comparatively modern times, and when the Courts came to deal with shares, or rights, or investments in it, they necessarily classified them with *choses in action* as contradistinguished from *choses in possession* which in ancient times consisted entirely of movable goods, visible and tangible in their nature. In this country no case has been cited, and we have found none, in which the question has directly arisen, but in *Hutchins vs. State Bank*, 12 *Metcalfe*, 421, Chief Justice SHAW, in delivering the opinion of the Court, said: " A State bond or note, a certificate of a sum due from the State or United States, and ordinarily called ' stock,' is a *chose in action* and an evidence of debt though no action lies for it." It is true this was a *dictum* in the case but it is the *dictum* of an able and distinguished jurist speaking for a Court of high authority. We adopt it and pronounce these bonds as well as the certificates of city stock *choses in action* of the wife.

2nd. The question whether the surviving husband during his life, and after the death of his wife, reduced them into his possession is equally free from difficulty. When Mrs. Hamill died the bonds were on special deposit in the Safe Deposit Company, where they had remained so on deposit since the 15th of December, 1871. The receipt given by the treasurer of that company on the last mentioned day, shows that Mrs. Hamill had deposited the bonds for safe-keeping " through Alex. Hamill and subject to order of either." At her death this *receipt* and the *certificates* for the city stock, were in the possession of her brother Mr. Bokee, and he, after her death, on the 9th of April, 1878, delivered them to her surviving husband, (taking his receipt therefor) who was then sick and infirm and remained unable to leave his house up to the time of his death. After the 9th of April, 1878, his son James, at his request, applied to Mr. Robb, the City Register, to

transfer the stock from the name of his wife to his own name, but Mr. Robb declined to do this unless Mr. Hamill came to the office in person for that purpose. The son also at the request of his father, went to the Safe Deposit Company and there presented to Mr. Wisong, its treasurer, the *receipt* for the bonds, and requested delivery of them to him, and said he would surrender the receipt therefor, but Wisong declined so to do, unless the father should appear in person, or execute a power of attorney to withdraw the bonds. Wisong then went to the residence of Mr. Hamill and was asked to go up to his chamber and receive a proper authority to deliver the bonds to his son, which he declined to do, and in a few days thereafter Mr. Hamill, who was then very infirm, died. At that time he was paralyzed but down to the time of his death was of sound mind, and might have made his mark at any time if he was so inclined. On the second of June, 1878, after his death the bonds were delivered by the Company to the defendants, as his administrators, on the return of the receipt. After the death of his wife none of the coupons on the bonds were ever cut off and delivered to Mr. Hamill during his life.

We do not mean to say what ought to have been done by the husband, or what acts on his part would have been sufficient to effect a reduction of these *choses in action* into his possession, but simply to decide that what was done in this case was wholly insufficient for that purpose. He never obtained manual possession of the bonds, (though we do not mean to say that would have been enough,) nor did he effect a transfer of the city stock into his own name. There is nothing to show he was not able at some time after the death of his wife, and before the 9th of April, 1878, to go in person to the Company's office, obtain the bonds and assign them for a valuable consideration, or sell them, or exchange them for other securities, and also to the Mayor's office and have the transfer of the

city stock to himself duly made. It may have been, and doubtless was, his misfortune that he became unable to do so after the 9th of April, 1878, or such inability may have continued from his wife's death, but this will not justify the Court in relaxing the law for his benefit, or that of his representatives, and in depriving the wife's next of kin of the benefit which the law gives them in case no *acts* have been done sufficient to defeat the survivorship. The authorities are all one way on this subject, and it is clearly settled that a mere intention to reduce a wife's *choses in action* into possession will not be sufficient; the acts to effect that purpose must be such as to change the property in them, or, in other words, must be something to devest the wife's property and to make that of the husband absolute. 1 *Bright on Husband and Wife,* 48 ; *Roper on Husband and Wife,* 208 ; 1 *Williams on Ex'rs,* 857. There must be some decisive and unequivocal act on the part of the husband, not only showing an intention to devest the property of the wife but which does in fact defeat such property. 3 *Redfield on Wills,* 189. The cases referred to by these writers, show that the mere pledge of his wife's *chose in action* by the husband, as security for his own debt, or the receipt by him of interest thereon, or even a part of the principal, will not defeat her right of suvivorship. Here no *act* whatever was done to devest the title of the wife, or her representatives. Some reliance was placed upon the terms in the receipt given by the Safe Deposit Company, to the effect that the bonds were subject to the order of " either " the wife or the husband, but it was admitted the bonds belonged to her and that she owned them in " her own right" when the deposit was made, and it is clear she did not part with the legal dominion and control over them by accepting a receipt in these terms. *Murray vs. Cannon,* 41 *Md.,* 466. The custody of them by the Company, after her death, was a continuance of the custody and deposit made by the wife,

and was never actually, or legally, or constructively, terminated by the husband during his life.

3rd. It was further argued that *trover* will not lie for the certificates of city stock, and that no recovery should be had on account thereof, because the stock still stands in the name of the wife on the books of the City Register and her administrator now owns it, if it does not belong to the husband's representatives. But by the terms of the certificates themselves, the stock can only be transferred at the Mayor's office upon their return and delivery, and the defendants have refused to deliver them up on demand of the plaintiff. As was said in the case of *Hutchins vs. State Bank,* before referred to, a certificate of stock is a muniment of title of the same nature with the note or bond of a private person, ordinarily called a *chose in action,* and it has been decided by this Court that *trover* may be maintained for the conversion of a promissory note or other *chose in action,* as well as for other personal property. *Winner vs. Penniman,* 35 *Md.,* 163. Besides judgment in this action against the defendants, and payment of it will vest in them the legal title to this stock as well as to the bonds. We, therefore, see no error in allowing a recovery on account of these certificates.

It follows there was no error in the rulings of the Court below upon the several prayers, and the judgment must be affirmed.

*Judgment affirmed,*
*with costs.*